```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
                  Civil No. 09-58(DSD/JJK)
```

The Loyalton Group, Inc.,

    Plaintiff,

v.                                                    **ORDER**

Burton Energy Group, Inc.,

    Defendant.

    Elizabeth C. Kramer, Esq., Robert T. Kugler, Esq., Peter J. Schwingler, Esq. and Leonard, Street and Deinard, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, counsel for plaintiff.

    Peter G. Nikolai, Esq. and Nikoli & Mersereau, 900 Second Avenue South, Suite 820, Minneapolis, MN 55402 and Peter F. Schoenthaler, Esq., Ryan B. Wilhelm, Esq., Martha Hagemeister, Esq. and Hill, Kertscher & Wharton, 3350 Riverwood Parkway, Suite 800, Atlanta, GA 30339, counsel for defendant.

This matter is before the court upon the motion of defendant Burton Energy Group, Inc.[1] ("BEG") for summary judgment. Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants BEG's motion in part.

**BACKGROUND**

The core dispute in this diversity action concerns the nature of the business relationship between BEG and plaintiff The Loyalton

---

[1] BEG is a Georgia corporation with its principal place of business in Roswell, Georgia. (Am. Compl. ¶ 2.)

Group, Inc.[2] ("Loyalton") from 2002 to 2008. During this period, Michael Brent Burton ("Burton") owned and operated BEG, providing energy consulting services to hoteliers. (Am. Compl. ¶ 2; Schoenthaler Decl.[3] Ex. 3 at 21-22.) Loyalton advises building owners and operators about energy risk management and offers services including utility data and price risk management and energy procurement. (Am. Compl. ¶ 1; Vaughan Decl. ¶ 2.)

According to Loyalton, the parties' conduct from 2002 to 2008 demonstrates that they formed a joint enterprise. BEG disagrees, and argues that the parties maintained a contractor/subcontractor relationship, with BEG acting as contractor. As required on a motion for summary judgment, the court recites the facts in a light most favorable to Loyalton, the nonmoving party.

The parties became acquainted through their work for non-party FelCor Lodging & Trust, Inc. ("FelCor").[4] In 2001, Burton entered into a consulting agreement with FelCor.[5] (Kramer Decl. Ex. 34 at 360.) The agreement tasked BEG with the responsibility of

---

[2] Loyalton is a Minnesota corporation with its principal place of business in Hastings, Minnesota. (Am. Compl. ¶ 1.) Loyalton formed after the December 31, 2007, merger of The Tharaldson Energy Group, Inc. with Aspen Energy, Inc. (Id.)

[3] All references to the Schoenthaler declaration refer to docket number 90.

[4] FelCor is a real estate investment trust that owns eighty-five consolidated hotels and resorts. (Am. Compl. ¶ 3.)

[5] Burton assigned the agreement to BEG in May 2002 after he incorporated the company. (Schoenthaler Decl. Ex. 5.)

"conduct[ing] due diligence and recommend[ing] [a] long-term Strategic Energy Partner, and applicable services to be rendered, for [FelCor]." (Id.) After evaluating several companies, BEG recommended that FelCor select Loyalton to provide data-management and energy-procurement services. (Schoenthaler Decl. Ex. 3 at 78-79.) On December 1, 2002, FelCor and Loyalton entered into a services agreement. (Kramer Decl. Ex. 35.) FelCor twice amended the agreement to extend its termination date to December 31, 2007. (Id. Ex. 50.) Thereafter, Loyalton worked for FelCor on a month-to-month basis. (See id. Ex. 51.)

Loyalton alleges that the parties jointly provided FelCor a comprehensive array of services. BEG focused on demand-side initiatives like purchasing energy-efficient supplies and fixtures, while Loyalton collected, paid and analyzed utility bills and purchased electricity and natural gas. (See id. Exs. 35-36.) While performing this work, the parties allegedly took steps to ensure their mutual success. For example, Loyalton gave BEG reports, information and data analysis that BEG later presented to FelCor as its own work product. (Id. Ex. 18 at 86, Exs. 39-41; Martin Sieh Decl. ¶ 7.) In return, BEG provided Loyalton advice and guidance about FelCor's management. (See Kramer Decl. Exs. 44-49.)

In addition to FelCor, Loyalton alleges that the parties partnered to solicit and work with other businesses. In 2006,

Loyalton helped BEG obtain business from Meyer-Jabara Hotels, Aimbridge Hospitality, Commonwealth Hotels, Inc. and Hersha Hospitality Trust (the "MACH clients") by preparing analyses for BEG's sales pitches and sharing information with BEG about the decisionmakers at these companies. (Id. Ex. 3, Ex. 4 at 127-49; Vaughan Decl. ¶ 3.) BEG and Loyalton allegedly performed distinct but complementary roles while working for the MACH clients. While BEG acted as a liaison to the MACH clients, Loyalton worked with energy suppliers and provided the personnel necessary to deliver the services. (Martin Sieh Decl. ¶ 3.)

In addition to the MACH clients, the parties allegedly sought business from other hotel owners and entities outside of the hospitality industry. For example, Loyalton asserts that it supported BEG's successful effort to become a consultant to the American Hotel & Lodging Association ("AHLA"), helped BEG create marketing materials aimed at AHLA members and later maintained a list with BEG of AHLA members from whom the parties sought business. (Vaughan Decl. ¶ 3; Kramer Decl. Ex. 5 at 147, 151-53, Exs. 6, 8-10.) The parties also made sales pitches to potential hotel clients outside the AHLA, including the Wyndham Hotels Group, Best Western, Windsor Capital Group and others. (Kramer Decl. Exs. 1, 11-13.) Lastly, the parties collaborated to solicit work from several universities and kept a target list of potential clients in the senior living sector. (Id. Exs. 14-15.)

4

Throughout their dealings, Loyalton contends that the parties treated their relationship as a joint enterprise. The parties allegedly referred to each other as "partners" or "BEG/TLG," and structured their work so BEG acted as a client contact while Loyalton performed data analysis and procured energy. (Id. Exs. 1-2, 12 (using "TLG" as an acronym for "The Loyalton Group"), Ex. 4 at 129-30, 138, 146.) BEG purportedly had complete access to Loyalton's employees and frequently called upon them for advice or help. (Id. Exs. 19-25, Ex. 18 at 80-81; Martin Sieh Decl. ¶ 4.) In addition, Loyalton shared proprietary and confidential information with BEG, and the parties apprised each other of third-party competition. (See Kramer Decl. Ex. 4 at 105, Exs. 26-30; Vaughan Decl. ¶ 9; Martin Sieh Decl. ¶ 6.) Loyalton maintains that it did not consider BEG a competitor until October 2008. (Kramer Decl. Ex. 31 at 135-36; Vaughan Decl. ¶¶ 6, 9.)

In the months preceding October 2008, Loyalton argues that BEG took covert steps to replace it as FelCor's "Strategic Energy Partner." According to Loyalton, BEG first suggested to FelCor that it consider alternatives to Loyalton in September 2007 and repeated this suggestion through early 2008. (Kramer Decl. Exs. 54-55.) In January 2008, BEG and FelCor allegedly began discussions about BEG taking over Loyalton's work. (Id. Ex. 5 at 202-04, Ex. 38 at 24-28.) Thereafter, Loyalton claims that Burton took steps to expand BEG - such as hiring two energy professionals

5

– so it could independently provide the same services as Loyalton. (See id. Ex. 58 at 11, Ex. 59 at 13.) At BEG's "first annual company meeting" on May 23, 2008, the company's goals included "build[ing] infrastructure for transition from Loyalton" and "operat[ing] independently of Loyalton by end of Q3." (Id. Ex. 61 at 28532, 28655, 28658.)

On August 25, 2008, BEG sent FelCor an "Energy Management Proposal." (Id. Ex. 64.) On October 6, 2008, FelCor hired BEG to perform the proposed work. (See id. Ex. 67.) Burton informed Loyalton of FelCor's decision on October 13, 2008. (See Vaughan Decl. ¶ 5.) The following day, Loyalton received a letter from FelCor terminating the services agreement. (Kramer Decl. Ex. 51.)

Loyalton commenced this action against BEG in state court on December 22, 2008, asserting claims for tortious interference with a prospective contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties and unjust enrichment.[6] BEG timely removed. On December 18, 2009, the court denied BEG's motion to dismiss in part Loyalton's claim for breach of fiduciary duties. The court now considers BEG's January 28, 2010, motion for summary judgment.

---

[6] Loyalton amended its complaint on September 29, 2009.

**DISCUSSION**

I.  **Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## II. Breach of Fiduciary Duties

Loyalton first claims that BEG breached fiduciary duties it owed Loyalton in the context of their alleged joint enterprise.[7] To succeed on this claim, Loyalton must demonstrate the existence of a fiduciary duty, breach, causation and damages. See State Farm Fire & Cas. v. Aquila Inc., 718 N.W.2d 879, 887 (Minn. 2006) (elements of negligence claim); Padco, Inc. v. Kinney & Lange, 444 N.W.2d 889, 891 (Minn. Ct. App. 1989) (negligence and breach of fiduciary duty claims use same elements).

As a preliminary matter, BEG argues that Loyalton cannot base its breach of fiduciary duties claim on a theory of joint enterprise. According to BEG, the joint enterprise doctrine exists solely to impute contributory negligence in personal injury cases. BEG's argument fails, however, because Minnesota courts have previously imposed fiduciary duties on business partners involved in joint enterprises. See Lipinski v. Lipinski, 35 N.W.2d 708, 712 (Minn. 1949) (imposing fiduciary duties on persons involved in joint enterprise); Irvine v. Campbell, 141 N.W. 108, 109 (Minn. 1913) (same).

In the alternative, BEG argues that Loyalton cannot establish the existence of a fiduciary duty because the parties did not form a joint enterprise. The court agrees. To establish a joint

---

[7] Loyalton concedes that the parties did not form a partnership. (Pl.'s Mem. Opp'n 20.)

enterprise Loyalton must show, "(1) a mutual understanding for a common purpose, and (2) a right to a voice in the direction and control of the means used to carry out the common purpose." Olson v. Ische, 343 N.W.2d 284, 288 (Minn. 1984) (citation omitted). The second element requires "the *legal right* to control the means used to carry out the common purpose." Id. (emphasis in original) (citation omitted). "Legal control" implies that the parties have an enforceable right to control one another. See Weber ex rel. Sanft v. Goetzke, 371 N.W.2d 611, 616 (Minn. Ct. App. 1985).

Loyalton contends that the parties shared the common purpose of increasing each other's revenue, and collaborated to achieve this goal by servicing FelCor and the MACH clients, and soliciting business from AHLA members and other entities. In addition, Loyalton argues that each party had a voice in directing their work for FelCor and deciding which new clients to solicit and how to service them. In response, BEG denies that the parties shared a common purpose and argues that the parties did not have mutual control of each other. Rather, BEG, acting as contractor, allegedly oversaw and directed Loyalton's subcontracting work for FelCor and other clients.

Even if the court assumes that a common purpose existed, Loyalton's claim fails. Although Loyalton presents myriad evidence showing that the parties maintained a close working relationship from 2002 to 2008, this evidence does not establish that the

9

parties had a legal right to control the means used to carry out their alleged common purpose. No evidence indicates that the parties exercised a mutual, enforceable right to control how they serviced or solicited FelCor or other clients. Rather, the evidence before the court shows that the parties worked for FelCor under two separate contracts, and neither contract gave the parties the right to control each other. (Kramer Decl. Exs. 34 & 35.) Accordingly, Loyalton has not established the existence of a joint enterprise creating fiduciary duties between the parties, and summary judgment is warranted on this claim.

**III. Tortious Interference with Prospective Contractual Relations**

Loyalton next claims that BEG unlawfully interfered with its prospective contractual relations with FelCor. Under Minnesota law, "'[o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relation.'" See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1981) (quoting Restatement (Second) of Torts § 766B (1979)). Liability results "'whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.'" Id. To determine if conduct constitutes improper interference, the court considers:

>           (a) the nature of the actor's conduct, (b) the
>           actor's motive, (c) the interests of the other
>           with which the actor's conduct interferes,
>           (d) the interests sought to be advanced by the
>           actor, (e) the social interests in protecting
>           the freedom of action of the actor and the
>           contractual interests of the other, (f) the
>           proximity or remoteness of the actor's conduct
>           to the interference and (g) the relations
>           between the parties.

Northside Mercury Sales & Servs., Inc. v. Ford Motor Co., 871 F.2d 758, 761 (8th Cir. 1989) (citing Restatement (Second) of Torts § 767 (1979)); R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 571 (Minn. Ct. App. 1996) (same).

Loyalton argues that BEG improperly interfered with its prospective contract with FelCor by making two misrepresentations to Loyalton.[8] First, Loyalton asserts that its management regularly attended quarterly meetings with FelCor executives to discuss energy initiatives. (Thomas Sieh Decl. ¶ 3; Kramer Decl. Ex. 37 at 19.) In the first quarter of 2008, BEG purportedly told Loyalton that a meeting with FelCor was not necessary. (Thomas Sieh Decl. ¶ 4.) BEG did not disclose, however, that FelCor did not want to meet with Loyalton because it was considering terminating Loyalton's services agreement. (Kramer Decl. Ex. 38 at 19.) Second, Loyalton maintains that BEG misrepresented the reason

---

[8] Loyalton also contends that BEG engaged in improper interference by breaching its fiduciary duties to Loyalton. The court does not consider this argument, however, because the court has already determined that BEG did not owe Loyalton fiduciary duties.

why FelCor did not execute certain energy contracts prepared by Loyalton in 2008. At the time, BEG allegedly told Loyalton that FelCor had not acted on the contracts due to financial problems. (Thomas Sieh Decl. ¶¶ 8-9.) Loyalton claims that BEG's statement was untrue and covered up BEG's plan to take over Loyalton's work. Loyalton argues that it would have taken steps to secure its relationship with FelCor if it had been aware of FelCor's impending decision to terminate its contract or BEG's competitive actions.

In response, BEG denies that it made any misrepresentations. Alternatively, BEG argues that even if it made misrepresentations, its conduct did not amount to improper interference. Further, BEG contends that Loyalton cannot establish that its alleged misconduct caused FelCor to terminate the services agreement. Rather, BEG asserts, FelCor chose not to renew the services agreement in 2007 due to its dissatisfaction with Loyalton's performance, and later asked BEG to take over the work. (Schoenthaler Decl. Ex. 1 at 19-20, 40, 46-47, 50, Ex. 2 at 117-18, Ex. 3 at 120.)

The court determines that genuine issues of material fact exist as to whether BEG improperly interfered with Loyalton's prospective contractual relations with FelCor[9] and whether BEG's

---

[9] Because a genuine issue of material fact exists as to whether BEG engaged in improper conduct, the court does not consider BEG's justification or privilege defenses. See Nordling v. N. States Power Co., 478 N.W.2d 498, 506 (Minn. 1991) (no justification or privilege defense if improper conduct used); United Wild Rice, 313 N.W.2d at 633 (competitor's privilege defense
(continued...)

improper interference induced FelCor not to continue its relationship with Loyalton. These disputed material facts preclude summary judgment, and the court denies BEG's motion with respect to this claim.

**IV. Breach of Implied Covenant of Good Faith and Fair Dealing**

Loyalton next claims that BEG breached the implied covenant of good faith and fair dealing by keeping information from Loyalton, establishing a competing business and soliciting Loyalton's clients. Under Minnesota law, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (internal quotation marks omitted). Loyalton argues that the parties' 2003 consulting agreement and October 2006 fee agreement contain this covenant. (Kramer Decl. Exs. 17 & 33.) The 2003 agreement governed consulting services provided to Loyalton by BEG from May to October 2003. (Id. Ex. 33.) The 2006 agreement created a fee structure for utility bill handling fees that BEG owed Loyalton for services it provided to the MACH clients. (Id. Ex. 17.)

---

⁹(...continued)
requires showing of no wrongful means) (citing Restatement (Second) of Torts § 768 (1979)); Harman v. Heartland Food Co., 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (legitimate interest in contract not a defense if improper means employed).

13

Loyalton's claim fails for two reasons. First, Loyalton has not asserted a breach of contract claim and, under Minnesota law, "a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim." Orthomet, Inc. v. A.B. Med., Inc., 990 F.2d 387, 392 (8th Cir. 1993); accord Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994). Second, the covenant applies only to the "performance of the contract" and "does not extend to actions beyond the scope of the underlying contract." In re Hennepin County, 540 N.W.2d at 502-03. Loyalton's claim concerns the parties' work for FelCor and other clients, not BEG's performance of the 2003 and 2006 agreements. Accordingly, summary judgment is warranted on this claim.

**V.    Unjust Enrichment**

Lastly, Loyalton alleges that BEG was unjustly enriched by its acquisition of the FelCor contract. To prevail on this claim, Loyalton must establish that BEG "knowingly received or obtained something of value for which [BEG] in equity and good conscience should pay." ServiceMaster of St. Cloud v. GAB Bus. Servs., 544 N.W.2d 302, 306 (Minn. 1996) (internal quotation marks omitted). Specifically, Loyalton must show that BEG was "unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." Id. (alteration in original) (citation omitted).

14

As previously noted, a genuine issue of material fact exists as to whether BEG improperly interfered with Loyalton's prospective contractual relations with FelCor.  Based on the determination of this fact issue, a reasonable jury could find that BEG was unjustly enriched as a result of its improper conduct.  Accordingly, the court denies BEG's summary judgment motion with respect to this claim.

## CONCLUSION

Accordingly, based on the above **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. No. 87] is granted in part.

Dated:  May 4, 2010

                                            s/David S. Doty
                                            David S. Doty, Judge
                                            United States District Court